# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* MASSIE FAMILY TRUST.

| | |
|---|---|
| CHERYL PLANTENGA and CATHERINE HORNBOGEN, | UNPUBLISHED<br>May 19, 2016 |
| Petitioners-Appellees, | |
| v | No. 326069<br>Marquette Probate Court |
| LINDA JUZENAS Trustee for MASSIE FAMILY TRUST, | LC No. 14-032775-TV |
| Respondent-Appellant. | |

Before: GLEICHER, P.J., and SAWYER and M. J. KELLY, JJ.

PER CURIAM.

As Clare Boothe Luce penned, "No good deed goes unpunished." That adage fits our facts. Acting as successor trustee for a trust created by her mother and stepfather, Linda Juzenas valiantly preserved the trust's sole asset—a house—ensuring that it did not fall into ruin or tax foreclosure. Juzenas failed to notify her co-secondary beneficiaries of her efforts. Based on this oversight, the probate court surcharged Juzenas $1,650.81, the sum of a property tax delinquency and homeowner's insurance premium Juzenas paid from her own pocket, and $150, petitioners' filing fee.

The other secondary beneficiaries suffered no harm as a result of Juzenas's failure to notify and were graced with an inheritance that likely was enriched by Juzenas's endeavors. Under these circumstances, the probate court abused its discretion in charging Juzenas for the tax and insurance obligations. We therefore reverse that portion of the lower court's order.

The lower court did correctly reject the bid of the trust's attorney for certain attorney fees and costs and we affirm that portion of the probate court's decision. However, the court miscalculated the attorney-fee figure and we remand to allow the court to make the required correction.

-1-

# I. BACKGROUND

Walter and Yvonne Massie established a living trust—the Massie Family Trust—on February 1, 1995. They named themselves the primary beneficiaries of the trust and the original trustees. As "secondary beneficiaries" the Massies named their five individual children from previous marriages. Yvonne's daughter, Linda Juzenas, was named as the successor trustee. The only asset placed in the trust was the couple's Marquette home.

Yvonne suffered from Alzheimer's Diseases and entered a nursing home in 2006. The following year, Walter died in a boating accident. In a letter dated January 12, 2009, the trust's attorney, Robert Anderson, advised the attorney for Walter's three children, William McDonald, that "Yvonne has resigned as a Trustee, but continues to be the primary beneficiary." Anderson forwarded McDonald a copy of the trust document, Walter's will bequeathing everything to Yvonne, and the beneficiary forms for Walter's life insurance policies, which also flowed to Yvonne. Anderson advised McDonald that the only asset in the trust was the house and its contents and that the couples' children "have contingent rights." "When Yvonne passes, I will help Linda sell the home and distribute the proceeds and contents to the five beneficiaries," Anderson concluded.

Following Walter's death, Yvonne gave Juzenas power of attorney to manage her personal assets (her Social Security and pension income and the proceeds of Walter's life insurance policies) and control her personal affairs. Through this power of attorney, Juzenas applied for Medicaid benefits for her mother to pay for the nursing home bills. To qualify for Medicaid, Yvonne could not possess more than $2,000 in liquid assets. Accordingly, Juzenas used Walter's life insurance policies to make repairs on the Massie house.

Anderson advised Juzenas that she could not sell the Massies' house until after Yvonne's death or Yvonne would be rendered ineligible for Medicaid. Aware that the taxes and insurance needed to be paid and the house maintained but that Yvonne lacked the financial means to meet these obligations, Juzenas secured a renter, Yvonne's nephew Joshua Ploof. Ploof lived in the home, performed home repairs and regular maintenance, and paid the utilities. He resided in the home from June 2009 through June 2013, and paid Juzenas $200 monthly to cover the tax and insurance burden. Juzenas believed that she conducted this business in her role as Yvonne's power of attorney. The Massies' home belonged to the trust, however, not solely to Yvonne. Accordingly, Juzenas actually managed the home in her dual roles as trustee and holder of Yvonne's power of attorney.

On July 1, 2013, McDonald sent Anderson a letter indicating that he was "uncertain" about the future of the trust and wanted additional information for his clients. McDonald "explained to [petitioners] that there should have been regular accountings for this trust since at least 2009 when Linda became trustee." McDonald noted, "It is also my client's understanding that the house has been occupied by someone other than Yvonne Massie. They have never received any information about that occupancy, nor have they been provided any information about rental income or expenses." McDonald referenced "some interest on the part of one of the family members in purchasing the residence" and urged Juzenas to secure an appraisal "so that decisions can be made."

Despite that sale of the house would prejudice Yvonne, Juzenas secured an appraisal that valued the home at $135,000. In a letter dated September 9, 2013, Anderson notified McDonald of this appraisal and that Patricia Ploof, Yvonne's sister, was an interested purchaser.

In a March 13, 2014 letter, McDonald threatened to pursue removal of Juzenas as trustee and to stall the sale of the Massie home unless Juzenas provided "information about the past history of the trust affairs." Yvonne died on March 24, 2014. One week later, Anderson informed McDonald that the "sale of the home, the Trust's only asset[,] is close to completion, and the sale proceeds may be available for distribution in the near future." Anderson contended that it had been unnecessary to draft trust accountings for 2009 through 2013 because the house was the only asset and it could not be sold in those years. Rather, all financial activity related to Yvonne's personal funds. Juzenas had secured a new tenant for the house in October 2013, and placed the tenant's $700 monthly rent "into a personal account and has not used any of the funds." Juzenas used her own funds to continue making property tax and insurance payments and intended to take reimbursement out of the sale proceeds. On July 1, 2014, after this suit was initiated, Anderson also forwarded a trust accounting to McDonald.

Dissatisfied with Anderson's responses, Walter's children filed a petition to remove Juzenas as the trustee on April 17, 2014. They alleged that Juzenas breached her duties by failing to provide an accounting to the trust beneficiaries, respond to the beneficiaries' inquiries regarding the nature and extent of the trust's assets, file appropriate tax returns, and maximize income for the trust. Petitioners eventually withdrew their request to have Juzenas removed from her position but sought other relief for Juzenas's "deficient" communications and "operating . . . 'outside of the books.'"

Ultimately, the probate court determined that petitioners were "qualified trust beneficiaries" who were entitled to ongoing notification about trust administration so they could protect their interests. Juzenas breached that duty by waiting a full year after petitioners' request to provide a trust accounting. The court also determined that Juzenas filed the trust's income tax return five weeks late. The court reasoned:

> This is not a case of fraud or extreme self-dealing on the part of a trustee. The Court does not find that the trustee had any specific intent to deplete the assets of the trust to the detriment of the beneficiaries. Rather it appears to this Court that the trustee acted in a negligent manner in handling the trust property and in responding to the inquiries of the qualified trust beneficiaries. The testimony of Linda Juzenas was clear that she did not even know when she became the trustee. She, according to her testimony, followed the direction of her legal counsel in "renting" out the trust property to her relative Josh Ploof for $200 per month. It was her understanding that if she rented the trust property out for a fair market value price the money would go directly to the nursing home for her mother's care. Rather than allow this to occur, an agreement was struck whereby Josh Ploof would pay $200 per month to his mother and she in turn would cover the taxes and insurance expenses of the property. This plan worked for a while, however, there is a claimed expense by the Trustee personally for $1,197.68 for property taxes that were not paid via the arrangement with Mr. Ploof. The trustee seeks reimbursement for the property taxes she alleges she paid out of her own

funds. She also seeks reimbursement for payment of insurance in the amount of $453.13.

Based on the evidence, the court determined that Juzenas "failed in her duty to inform and report per MCL 700.7814." Only when petitioners filed their court action did "the trustee begin in earnest to respond to the Petitioner[s'] inquiries." The rental information was not provided until the court hearing, the probate court found. Yet, the court acknowledged, the petitioners did "not assert great damage for failure to provide the information."

The court then ordered Juzenas to reimburse petitioners their $150 filing fee. The court denied Juzenas's request for reimbursement of the tax and insurance payments she made from her personal funds as "[t]hese debts should have been paid out of the rental fees per the agreement with the Ploofs." The court then provided specific direction to Juzenas regarding the tasks and deadlines remaining to complete the trust's business.

Juzenas thereafter sought a court order approving the attorney fees expended in the trust's administration. The July 1, 2014 accounting reflected that the trust had already paid Anderson's firm $3,744 for work from May 6, 2013 through July 2, 2014. Anderson sought an additional $5,846.25 for his work from July 8 through September 30, 2014, and $7,348 in attorney fees from October 10 through December 22, 2014. Juzenas asserted that the attorney fees were not attributable to her, but rather the petitioners and the manner in which McDonald "conducted himself and engaged in allegedly pointless litigation." The court acknowledged the parties' agreement that the "total receipts of the trust equal $122,932.40." But the parties also disagreed on the proper amount of trustee expenses to reimburse Juzenas. Juzenas sought nearly $7,000, while petitioners calculated her expenses at $5,000. The court accepted Juzenas's figure but reduced the amount by the value of the property tax and insurance bill that Juzenas had personally paid as she had already taken reimbursement from trust funds. The court denied Anderson's request for attorney fees between October 10 and December 22, 2014, finding that these fees were accumulated in his quest to preserve and prove the attorney fee award. The court also disallowed certain expenses related to the court proceedings.

Juzenas now appeals.

## II. BREACH OF DUTY TO KEEP BENEFICIARIES INFORMED

Petitioners charged that Juzenas was required to provide them an accounting every year beginning in 2009, and was required to provide notification about the rental of the Massies' house. Petitioners contend that Juzenas withheld all information in violation of the Michigan Trust Code. MCL 700.7814 governs notification and reporting duties and provides, in relevant part:

(1) A trustee shall keep the qualified trust beneficiaries reasonably informed about the administration of the trust and of the material facts necessary for them to protect their interests. Unless unreasonable under the circumstances, a trustee shall promptly respond to a trust beneficiary's request for information related to the administration of the trust.

(2) A trustee shall do all of the following:

-4-

(a) Upon the reasonable request of a trust beneficiary, promptly furnish to the trust beneficiary a copy of the terms of the trust that describe or affect the trust beneficiary's interest and relevant information about the trust property.

(b) Subject to subsection (6), within 63 days after accepting a trusteeship, notify the qualified trust beneficiaries of the acceptance, of the court in which the trust is registered, if it is registered, and of the trustee's name, address, and telephone number.

(c) Subject to subsection (6), within 63 days after the date the trustee acquires knowledge of the creation of an irrevocable trust, or the date the trustee acquires knowledge that a formerly revocable trust has become irrevocable, whether by the death of the settlor or otherwise, notify the qualified trust beneficiaries of the trust's existence, of the identity of the settlor or settlors, of the court in which the trust is registered, if it is registered, and of the right to request a copy of the terms of the trust that describe or affect the trust beneficiary's interests.

(d) Notify the qualified trust beneficiaries in advance of any change in the method or rate of the trustee's compensation.

(3) A trustee shall send to the distributees or permissible distributees of trust income or principal, and to other qualified or nonqualified trust beneficiaries who request it, at least annually and at the termination of the trust, a report of the trust property, liabilities, receipts, and disbursements, including the source and amount of the trustee's compensation, a listing of the trust property and, if feasible, their respective market values, and, if applicable, any disclosure required under [MCL 700.7802(5)]. In the trustee's discretion, the trustee may provide the report to any trust beneficiary. Upon a vacancy in a trusteeship, unless a cotrustee remains in office, a report shall be sent to the qualified trust beneficiaries by the former trustee. A personal representative, conservator, or guardian may send the qualified trust beneficiaries a report on behalf of a deceased or incapacitated trustee.

Arguably, Juzenas became trustee on approximately January 12, 2009, when Anderson advised McDonald that Yvonne had resigned as trustee. This triggered Yvonne's reporting duties. However, petitioners did not become "qualified trust beneficiaries" entitled to automatic notification until Yvonne's March 24, 2014 death. And Juzenas harbored no confusion that her trusteeship began on that date pursuant to the terms of the trust.

As used in MCL 700.7814, a "qualified trust beneficiary" is

[A] trust beneficiary to whom 1 or more of the following apply on the date the trust beneficiary's qualification is determined:

(*i*) The trust beneficiary is a distributee or permissible distributee of trust income or principal.

-5-

(*ii*) The trust beneficiary would be a distributee or permissible distributee of trust income or principal if the interests of the distributees under the trust described in subparagraph (*i*) terminated on that date without causing the trust to terminate.

(*iii*) The trust beneficiary would be a distributee or permissible distributee of trust income or principal if the trust terminated on that date. [MCL 700.7103(g).]

A "trust beneficiary" in turn is

[A] person to whom 1 or both of the following apply:

(*i*) The person has a present or future beneficial interest in a trust, vested or contingent.

(*ii*) The person holds a power of appointment over trust property in a capacity other than that of trustee. [MCL 700.7103(*l*).]

As described by the Reporter, the Legislature distinguished between qualified and unqualified beneficiaries

because of the difficulties that can arise in identifying more remote or contingent beneficiaries. A second reason for the distinction is to reduce the difficulties that would arise in the administration of trusts if those whose interests are remote or contingent routinely were required to receive certain notices, accountings for the trust, and court proceedings involving certain matters when their interests are remote. [Martin & Harder, *Estates and Protected Individuals Code with Reporter's Commentary* (ICLE, January 2016), p 473.]

Upon Yvonne's death, any confusion about the potential beneficiaries ended and petitioners became qualified trust beneficiaries. At that time, Juzenas was required to automatically keep them "reasonably informed about the administration of the trust and of the material facts necessary for them to protect their interests." In the meantime, however, unqualified trust beneficiaries are entitled to request information to protect their interests, and petitioners made such a request on July 1, 2013.[1] Juzenas did not "promptly furnish" the requested information as required by MCL 700.7814(2). Instead, Anderson trickled information about the home appraisal and potential sale, and waited until after the current proceedings were initiated to provide information regarding Juzenas's efforts to maintain the value of the property

---

[1] That the primary beneficiary and settlor of the trust, Yvonne, was still alive did not eliminate Juzenas's duty to provide information upon petitioners' request during Yvonne's life. Pursuant to MCL 700.7603(2), a trustee must keep those beneficiaries who will become qualified upon the settlor's death "reasonably informed of [the trust's] administration" if "the trustee reasonably believes that the settlor . . . is an incapacitated individual."

while protecting Yvonne's financial needs. This violated MCL 700.7814 as concluded by the probate court.

### III. SURCHARGE

Juzenas challenges the probate court's denial of her reimbursement request for the personal funds she expended to cover the property tax delinquency and homeowner's insurance premium and charging her for the petitioner's $150 filing fee.

We review for an abuse of discretion a probate court's decision to surcharge a trustee. *In re Baldwin Trust*, 274 Mich App 387, 397; 733 NW2d 419 (2007). The "abuse of discretion standard acknowledges that there will be circumstances in which there will be no single correct outcome; rather, there will be more than one reasonable and principled outcome." A court acts within its discretion when it "selects one of these principled outcomes." *Maldonado v Ford Motor Co*, 476 Mich 372, 388; 719 NW2d 809 (2006) (quotation marks and citations omitted).

The authority to surcharge a trustee is based in part on harm caused to the trust. As described in *In re Estate of Thacker*, 137 Mich App 253, 263-264; 358 NW2d 342 (1984), relied upon in *Baldwin*, a trustee "may be deprived of all or part of the compensation it would otherwise be entitled to" if the trustee's "negligence causes harm to an estate."

The authority to surcharge is also based on the trustee's conduct. In exercising its discretion to surcharge a trustee, a court must be cognizant of "the common law principle that trustees may not be liable for mere mistakes or errors of judgment where they have acted *in good faith* and within the limits of the law and of the trust." *In re Green Charitable Trust*, 172 Mich App 298, 314; 431 NW2d 492 (1988) (emphasis added). "Good faith" in this context describes the actor's state of mind and intentions. It reflects a party's honesty and exercise of best judgment. See *People v Downes*, 394 Mich 17, 25-26; 228 NW2d 212 (1975); *Shaffner v Riverview*, 154 Mich App 514, 518; 397 NW2d 835 (1986), *Random House Webster's College Dictionary* (2000); *Black's Law Dictionary* (6th ed). Bad faith is not commensurate with "negligence or bad judgment, so long as the actions were made honestly and without concealment." *Commercial Union Ins Co v Liberty Mut Ins Co*, 426 Mich 127, 137; 393 NW2d 161 (1986). Bad faith can exist, however, when the actor "is motivated by selfish purpose or by a desire to protect its own interests at the expense of" those to whom she owes a fiduciary duty. *Id.*

The probate court specifically found that Juzenas did not act in bad faith. Juzenas was merely negligent in that she did not understand that she became trustee in 2009 and owed a duty to petitioners thereafter. This misunderstanding was reasonable as it was based on the advice of counsel and because Yvonne, the trust settlor and primary beneficiary, was still alive. Juzenas did not profit from her actions; rather, she acted completely for the benefit of Yvonne and the trust. Juzenas managed the trust property to maximize Yvonne's eligibility for Medicaid during her lengthy battle with Alzheimer's, which required an expensive eight-year nursing home sojourn. This left no cash to maintain the Marquette home, insure the building and its contents, or meet tax obligations. Juzenas calculated the necessary amount to pay the insurance premiums and property tax bills, while not accumulating excess funds that would destroy Yvonne's Medicaid eligibility. This resulted in a charge of $200 each month to Ploof. And Ploof

maintained the home so its value was not reduced during Yvonne's long absence. Had Juzenas not acted in this manner, she would have had to sell the home to pay Yvonne's staggering medical bills and petitioners would have had no inheritance.

The only damage petitioners can cite is $453.13 in insurance premiums and $1,197.68 in property taxes that were not charged to any tenant. Juzenas paid these obligations from her own funds and justly expected reimbursement from the trust. Reimbursement for the insurance premium did not harm the trust. The premium came due at a time when the home was vacant. Ploof, financially unable to purchase the home, had quitted the residence to permit its sale. The new tenants and potential purchasers secured by Juzenas had yet to take residence. The home required insurance to protect the interests of the trust beneficiaries. Accordingly, the probate court abused its discretion in denying Juzenas's request for reimbursement and by finding that Ploof should have paid these costs.

In early 2014, Juzenas received notification that she was not entitled to claim the Marquette home as Yvonne's homestead in 2012, and therefore underpaid property taxes by $1,197.68. Petitioners wanted Juzenas to charge this amount against Ploof because he resided in the home that year. Juzenas declined to take such action as the payment of these additional taxes was not part of their rental agreement and notice of the delinquency came long after Ploof moved from the home. Juzenas could not have known that the taxing authority would take this position and the rent she collected to meet the insurance and tax obligations was reasonable at the time. Absent any selfish motive or bad faith on her part, the probate court also abused its discretion in reducing Juzenas's share of the trust by this amount.

However, we discern no abuse of discretion in the probate court's surcharge of $150 representing petitioner's filing fee. As correctly noted by the court, Juzenas provided inadequate information to the qualified trust beneficiaries until they threatened to remove her as trustee. Charging the cost of filing the action against a trustee who fails to meet her notification duties is within the range of reasonable and principled outcomes.

## IV. ATTORNEY FEES

The trust authorizes the trustee "[t]o employ and compensate . . . attorneys-at-law . . . needful for the proper administration of the Trust Estate." Further, a probate court may allow a trustee to charge reasonable expenses against the trust assets, including attorney fees that are incurred while rendering services to the trustee in his or her capacity as a trustee. *In re Temple Marital Trust*, 278 Mich App 122, 134; 748 NW2d 265 (2008). To this end, at the hearing on petitioners' objections to the final trust accounting, Anderson gave a detailed account of the legal work he had performed. He also presented detailed invoices for the court's review. Anderson indicated that the estimated flat fee for a "simple trust closing and estate trust administration" is $1,550, based on an hourly rate of $220.

The probate court took no exception with the fees already paid from the trust's assets for work undertaken between May 6, 2013 and July 2, 2014. These fees were incurred "for the routine and normal administration of the trust" and "responding to Petitioners['] requests for information." The court then determined that the fees accumulated from October 10 through December 22, 2014 were not reimbursable from trust assets because the underlying work was

"focused on preserving and proving attorney fees." The invoices reflected that Anderson and his employees spent 11.95 hours researching attorney-fee issues and 5.6 hours "for attorney time discussing the manner in which to preserve the attorney fee claim." Even if this work was reimbursable, the court found the time spent unreasonable.

The court then outlined the specific tasks identified on invoices from July 18 through September 30, 2014. At the onset of this action, the probate court entered a default judgment because Juzenas, in her role as trustee and represented by Anderson, failed to respond to the petition. Anderson charged for the time he spent seeking to have the default set aside. The court reasoned that Anderson should not be permitted to reduce the value of the petitioners' shares of the trust "to pay for the error of legal counsel allowing a default to be entered." The court therefore disallowed payment of $330 for Anderson's time and reimbursement for $120 Anderson paid to McDonald based on a court order for McDonald's costs in the default proceedings. The court also discovered an additional $704 in fees charged for legal research on collecting attorney fees during this time period.

Juzenas now challenges the probate court's rejection of these attorney fees. We review for clear error the findings of fact underlying an award of attorney fees, *Brown v Home Owners Ins Co*, 298 Mich App 678, 690; 828 NW2d 400 (2012), and underlying questions of law de novo, *Loutts v Loutts*, 298 Mich App 21, 24; 826 NW2d 152 (2012). The decision whether to award attorney fees and the discernment of reasonable fees are within the court's discretion. *Temple Marital Trust*, 278 Mich App at 128.

MCL 700.7904 governs the payment of attorney fees in a trust action as follows:

> (2) Subject to subsection (3), if a trustee participates in a civil action or proceeding in good faith, whether successful or not, the trustee is entitled to receive from trust property all expenses and disbursements including reasonable attorney fees that the trustee incurs in connection with its participation.

> (3) A court may reduce or deny a trustee's claim for compensation, expenses, or disbursements with respect to a breach of trust.

Consistent with this statute, a trustee may charge attorney fees and expenses to the trust estate incurred in defending an action challenging the trustee's performance of her duties where no wrongdoing is proved. *Temple Marital Trust*, 278 Mich App at 135. The fees charged must be "reasonable under the circumstances." *Id.*; see also MCL 700.7708(1).

We discern no error in the probate court's refusal of Anderson's request for reimbursement of the fees associated with the default proceedings. Requiring Anderson to cover McDonald's costs was consistent with the conditions imposed in MCR 2.603(D)(4) for setting aside a default judgment. A default would not have entered had Anderson acted reasonably and promptly. Accordingly, the probate court acted within its discretion in determining that the trust should not be responsible for these fees and costs.

The majority of fees disallowed by the probate court were related to Anderson's attempts to calculate and collect his attorney fees from the trust. This Court has forbidden the charging of

such fees against a trust or estate, however. In *In re Sloan Estate*, 212 Mich App 357, 362-363; 538 NW2d 47 (1995), this Court held:

> The appellate courts of this state have consistently held that legal services rendered in behalf of an estate are compensable where the services confer a benefit on the estate by either increasing or preserving the estate's assets. . . .
>
> "Fees for fees" claims are brought in behalf of the attorney seeking the fees and clearly do not benefit the estate because they do not increase or preserve the estate's assets. . . . [T]he ordinary fees and costs incurred in establishing and defending a fee petition are inherent in the normal course of doing business as an attorney, and the estate may not be diminished to pay those fees and costs. [Citations omitted.]

The only exception to the prohibition of fees-for-fees is "where extraordinary fees and costs are incurred because of an opposing party's fraud, unjustified objections raised in bad faith, or other extraordinary circumstance." Under such circumstances, the probate court may shift attorney fees as a sanction. *Id.* at 363 n 2 (emphasis omitted). As there is no record indication that petitioners engaged in such misconduct, the probate court properly disallowed those fees amassed in Anderson's attorney-fee pursuit.

Juzenas argues that *Sloan Estate* is inapplicable because it applied "the now-repealed § 543 of the 1979 Michigan Revised Probate Code" (RPC), MCL 700.1 *et seq.* This Court did not rely solely on the statute in its reasoning, however. The panel examined historical caselaw on the issue before determining that a fiduciary, such as a trust's attorney, may not charge the trust for his efforts in "establish[ing] and defend[ing] a petition for attorney fees." *Sloan Estate*, 212 Mich App at 362-363.

Yet, we must remand for correction of the probate court's order based on a mathematical error in its calculations. For the period of July 8 through September 30, 2014, Anderson billed a total of $4,692.29. The probate court disallowed $330 claimed to prepare and attend the default hearing, $704 for defending the petition for attorney fees, and $120 for court-ordered reimbursement to McDonald. The total disallowed fees amounted to $1,154, leaving a total of $3,538.29 that Anderson could charge against the trust. The probate court incorrectly stated that the total allowed fees were only $3,041.44.

We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Elizabeth L. Gleicher
/s/ David H. Sawyer
/s/ Michael J. Kelly